UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 06-10293-RWZ

US SOLARTECH, INC.

v.

J-FIBER, GMBH

MEMORANDUM OF DECISION

April 24, 2013

ZOBEL, D.J.

This case revolves around four U.S. patents, one U.S. patent application, and their foreign counterparts. Plaintiff US SolarTech, Inc. ("SolarTech")[1] claims that it is the sole owner of those patent assets because it purchased them in the bankruptcy of FiberCore, Inc. ("FiberCore"). In response, defendant and counterclaimant j-fiber, GmbH ("j-fiber") claims that it is a co-owner of the patent assets because it purchased the ownership interests of FiberCore's wholly-owned subsidiary FiberCore Jena GmbH ("FC Jena"). j-fiber asserts in the alternative that it owns shop rights over the claimed inventions.

SolarTech now moves for summary judgment on all claims, and j-fiber cross-moves for summary judgment on its claim of shop rights.

---

[1] SolarTech was previously known as Silica Tech, LLC. This opinion refers to it as SolarTech throughout.

## I. Background

### A. The Inventors

FiberCore, a Nevada corporation headquartered in Massachusetts, was founded in 1993 to develop, manufacture, and sell optical fibers. Mohammed Aslami, one of the inventors on all the patents at issue here, was a co-founder of FiberCore; he also served as its first president, CEO, and chairman. Dau Wu, another inventor on all the patents at issue, joined FiberCore in 1994.

In that same year, FiberCore acquired a German company with an optical fiber manufacturing facility in Jena, Germany. That German company became FC Jena, a wholly-owned subsidiary of FiberCore. FC Jena's operations were funded in part by grants and subsidized loans sponsored by the German government and the European Union. That funding was intended to develop new industry in the former German Democratic Republic. Many of the grants and loans required that the technology developed by FC Jena would remain available for FC Jena's use.

Over the following years, Aslami and Wu worked for FiberCore on alternative technologies for manufacturing optical fibers. In late 1996 or 1997, Aslami visited a research facility in St. Petersburg, Russia, where he met Russian scientists Evgeny Danilov and Mikhail Guskov. Aslami and Wu began working with Danilov and Guskov in 1997 to carry out further research on optical fiber production.

On June 28, 1997, Danilov and Guskov signed formal employment agreements with FiberCore. Those agreements provided that Danilov and Guskov would be paid by FiberCore to do research on optical fiber technology. By their terms, the agreements

came into effect on July 1, 1997 and extended until December 31 of that year.

Danilov and Guskov subsequently entered into new employment agreements with FiberCore, along with accompanying intellectual property agreements.[2] The new employment agreements extended from January 1, 1998 through December 31, 2000. Under the employment agreements and the intellectual property agreements, Danilov and Guskov transferred to FiberCore their entire interest in any relevant technology they developed during their employment. In return, FiberCore agreed to pay Danilov and Guskov through salaries, bonuses, and stock options.

Beginning in 1999, Danilov and Guskov traveled regularly to Jena to do research there. At some point, they made Jena their new headquarters. j-fiber has submitted invoices and receipts showing that FC Jena paid for travel costs and living expenses incurred by Danilov and Guskov during their trips from St. Petersburg to Jena. In addition, j-fiber has produced an affidavit by Lothar Brehm, a managing director and founder of j-fiber who previously led a research team at FC Jena. Brehm states that while Danilov and Guskov were working in Germany, they were members of his research team at FC Jena. The research team originally worked in a facility leased by FC Jena and outfitted by FC Jena in accordance with Danilov's and Guskov's instructions. Later, the team moved to a new laboratory building whose construction was funded by FiberCore Glas GmbH ("FC Glas"), a wholly-owned subsidiary of FC Jena. Brehm also affirms that FC Jena paid almost all of Danilov's and Guskov's

---

[2] The new agreements ran between each scientist and "FiberCore . . . including its affiliates and subsidiaries." Docket # 150, Ex. 11, at 1. j-fiber concedes this language made Danilov and Guskov employees of FiberCore, not FC Jena. See Docket # 176, ¶ 12.

3

salaries and expenses, either directly or by reimbursing FiberCore or other entities.

In late 2000 and early 2001, Danilov and Guskov entered into interim employment agreements extending their employment with FiberCore through June 30, 2001. They subsequently signed three-year employment contracts with FiberCore Quarz, GmbH ("FC Quarz"), a separate wholly-owned German subsidiary of FiberCore. The relevant terms of these employment agreements were substantially similar to Danilov's and Guskov's previous employment agreements. By their terms, these agreements extended from July 1, 2001 through June 30, 2004.

Although Danilov and Guskov had signed employment agreements with FC Quarz, a separate agreement between FC Jena and FC Quarz stated that Danilov and Guskov would be "working with" FC Jena from July 1, 2001 onwards, and that FC Jena would "refund" to FC Quarz "all expenses arising after the employment contract [agreed] with the Russian employees." Docket # 175, Ex. F (alteration in original). A second agreement between FC Quarz and FC Glas, which became effective on September 1, 2003, stated that FC Quarz would allow Danilov and Guskov to "become employees" of FC Glas and that FC Glas would pay their salaries and benefits directly from August 2003 onwards.

### B. The Patents

Four patents and one patent application are at issue in this case, along with their foreign counterparts. The patent assets in question are United States Patents No. 6,253,580 ("the '580 Patent"); No. 6,536,240 ("the '240 Patent"); No. 6,793,775 ("the '775 Patent"); No. 6,769,275 ("the '275 Patent"); and U.S. Patent Application No.

09/058,207 ("the '207 Patent Application"). All of these patent assets relate to inventions in the manufacture of optical fibers.

Aslami, Wu, Danilov, and Guskov are listed as inventors on all of the patent assets. In addition, FiberCore employee John Mattison is listed as an inventor on the '207 application and the '240 patent, and FC Jena employee Wolfgang Hammerle is listed as an inventor on the '275 patent.

All the inventors on all the patent assets at issue assigned their entire interest in the claimed inventions to FiberCore, and those assignments were recorded.[3] All the inventors on all the patent assets except the '275 patent were formally employed by FiberCore when the relevant applications were filed, and were required by their employment agreements to assign any relevant intellectual property to FiberCore. As for the '275 patent, Danilov and Guskov were formally employed by FC Quarz but working with FC Jena when it was filed, while Hammerle was formally employed by FC Jena.[4] The '580 patent and the '207 patent application were filed before Danilov and Guskov began working in Germany; the '240 patent, the '775 patent, and the '275 patent were filed afterwards.

---

[3] j-fiber has submitted a declaration by Hammerle that he "has no knowledge of such assignment and never intended to assign any of [his] rights to FiberCore." Docket # 174, ¶ 10. But j-fiber does not claim that the notarized assignment in the record is a fraud or forgery, and Hammerle's declaration is not sufficient to create a genuine issue of material fact as to its validity. See Scott v. Harris, 550 U.S. 372, 378-81 (2007); DeLuca v. Bear Stearns & Co., 175 F. Supp. 2d 102, 115 (D. Mass. 2001) ("In the absence of fraud, a person who signs a written agreement is bound by its terms whether she reads and understands them or not.").

[4] Although Hammerle was an employee of FC Jena, he also signed an intellectual property agreement in which he assigned all interest in any relevant intellectual property to "FiberCore, its subsidiaries, affiliates, successors, and assigns." Docket # 150, Ex. 15. The parties have not briefed whether this agreement required Hammerle to assign his intellectual property rights to FiberCore rather than FC Jena. In any case, it is clear from the record that Hammerle in fact assigned his interest in the '275 patent to FiberCore. See supra note 3.

5

### C. The Parties

In November 2003, FiberCore filed for bankruptcy in Massachusetts; FC Jena subsequently filed for bankruptcy in Germany. In March 2004, j-fiber purchased from FC Jena all of its intellectual property rights in the patent assets at issue. j-fiber then filed an adversary complaint in FiberCore's bankruptcy, asserting an ownership interest in the patent assets.

In 2005, SolarTech agreed to purchase all of FiberCore's patent assets, including FiberCore's rights in the patents at issue here. The bankruptcy court confirmed the sale, subject to j-fiber's continued claim of ownership interest in the same patent assets. This court is now asked to adjudicate whether any interest in the patent assets belonged to FC Jena and was sold to j-fiber, or whether instead the patent assets belonged entirely to FiberCore and so now to SolarTech.

## II. Legal Standard

Summary judgment will be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court must view the record in the light most favorable to the nonmovant and draw all justifiable inferences in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). If the evidence would allow a reasonable jury to return a verdict for the nonmovant, summary judgment must be denied. Id at 248.

## III. Analysis

### A. Co-Ownership

j-fiber asserts first that FC Jena had a co-ownership interest in the patent assets

because Danilov and Guskov were "de facto" employees of FC Jena. It argues that the court should disregard the written employment contracts and assignments, and look instead to the fact that Danilov and Guskov were paid by FC Jena and did their research in FC Jena's facilities.

In patent law, the general rule is that "rights in an invention belong to the inventor." Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., 131 S. Ct. 2188, 2192 (2011). As with any property, an inventor can assign his rights in an invention to another party. 35 U.S.C. § 261; Roche, 131 S. Ct. at 2195. Recording that assignment with the U.S. Patent and Trademark Office "creates a presumption of validity as to the assignment and places the burden to rebut such a showing on one challenging the assignment." SiRF Tech. v. Int'l Trade Comm'n, 601 F.3d 1319, 1328 (Fed. Cir. 2010).

Although an employee generally owns the rights to his own inventions, "where an employee is hired to invent something or solve a particular problem, the property of the invention related to this effort may belong to the employer." Banks v. Unisys Corp., 228 F.3d 1357, 1359 (Fed. Cir. 2000). This exception is conceptually based on an implied contract between the employee and employer to assign the patent rights. Id.

As described above, the assignments by which Danilov and Guskov transferred their patent rights to FiberCore were recorded. j-fiber therefore bears the burden to show that the assignments were invalid. To meet that burden, j-fiber argues that the patents belonged to FC Jena because FC Jena hired Danilov and Guskov to create those inventions.

As to the '580 patent and the '207 patent application, a reasonable jury could not conclude that FC Jena hired Danilov and Guskov to produce these inventions. The '580 patent and the '207 application were filed before Danilov and Guskov began working in Germany. FC Jena could not possibly have hired Danilov and Guskov to invent what they had already invented.

The case is somewhat closer for the '240 patent and the '775 patent, but still not close enough that a reasonable jury could find for j-fiber. j-fiber's evidence shows that Danilov and Guskov were paid by FC Jena and worked in facilities owned by FC Jena. But the written employment agreements indisputably show that Danilov and Guskov were hired directly by FiberCore, and that they agreed to assign their patent rights to that parent entity. j-fiber cites no law for the proposition that a parent company paying its employees through a subsidiary thereby creates an implied employment agreement between the employees and the subsidiary. Given that Danilov and Guskov were explicitly hired by the parent company FiberCore, no reasonable jury could find that they were at the same time implicitly hired by its wholly-owned subsidiary FC Jena. Therefore, FC Jena cannot claim ownership of the '240 and '775 patents based on its purported employment of Danilov and Guskov.

But the case is substantially different with respect to the '275 patent. First, one of the inventors on that patent—Hammerle—was undisputedly an FC Jena employee. His declaration presents sufficient evidence that a reasonable jury might conclude he was employed by FC Jena to invent the '275 patent. Second, a reasonable jury could find that the 2001 agreement between FC Quarz and FC Jena was intended to substitute

FC Jena as Danilov's and Guskov's employer. If FC Jena employed Hammerle, or Danilov and Guskov, to invent the '275 patent, then FC Jena would be entitled to their interest in the patent and the employed scientist(s) could not assign it elsewhere. Cf. Banks, 228 F.3d at 1357.[5]

To summarize, SolarTech is entitled to summary judgment of sole ownership over the '580, '240, and '775 patents as well as the '207 patent application. However, it is not entitled to summary judgment as to the '275 patent.

### B. Tort Claims

j-fiber also claims that it is entitled to an ownership interest in the patent assets based on theories of conversion and fraudulent conveyance. Neither succeeds.

Conversion, of course, is "an intentional or wrongful exercise of dominion or control over personal property of another by one with no right to immediate possession." Kelley v. LaForce, 288 F.3d 1, 11 (1st Cir. 2002). j-fiber's conversion theory asserts that FiberCore wrongfully induced Danilov, Guskov, and Hammerle to convey their interest in the disputed patents to FiberCore rather than FC Jena. The most obvious problem with this claim is its redundancy. To prove conversion, j-fiber must establish that FC Jena was entitled to the allegedly converted interests. But the only relief j-fiber seeks on the conversion claim is a declaration that FC Jena was entitled (and now j-fiber is entitled) to the allegedly converted interests. As such, the

---

[5] j-fiber also argues briefly that any assignment of patent rights by Danilov and Guskov to FiberCore was invalid because under German law (1) Danilov and Guskov were required to offer the patents to FC Jena first; and (2) any assignment to FiberCore violated FiberCore's fiduciary duty to FC Jena. But this court has already decided the validity of the assignments is governed by Massachusetts law. See Docket # 74 at 60-61. j-fiber gives no reason to revisit that decision. As the asserted violations of German law do not affect the validity of the assignments under Massachusetts law, j-fiber's arguments must fail.

conversion claim simply reduplicates the declaratory judgment action. It is therefore dismissed.

As for j-fiber's fraudulent conveyance theory, it asserts that the assignments were fraudulent conveyances because they removed assets from FC Jena (which thereafter entered bankruptcy) with intent to defraud FC Jena's creditors. Again, this claim is redundant; it depends on the premise that the patent assets belonged to FC Jena, but the only relief sought is a declaration that the patent assets belonged to FC Jena (and so now to j-fiber). Moreover, j-fiber appears not to have standing for this claim, since it has not alleged facts showing it was a creditor of FC Jena.[6] This claim is also dismissed.

### C. Shop Rights

Finally, j-fiber asserts in the alternative that it is entitled to shop rights over all of the patent assets. "The classic 'shop right' doctrine provides that an employee who uses his employer's resources to conceive an invention or reduce it to practice must afford to his employer a nonexclusive, royalty-free, nontransferable license to make use of the invention . . . ." 8 Donald S. Chisum, Chisum on Patents § 22.03[3] (Lexis 2013). j-fiber argues that FC Jena obtained shop rights in all the patent assets at issue because Danilov, Guskov, and Hammerle used FC Jena's resources and facilities to create their inventions and reduce them to practice.[7]

---

[6] j-fiber cannot show standing as a creditor of FiberCore, since the alleged fraudulent conveyance transferred assets into FiberCore's bankruptcy estate.

[7] It is not clear whether shop rights are limited to the employer-employee context. See Chisum § 22.03[3][g] & nn.44-45. The court need not resolve that question here, because j-fiber is not entitled to shop rights in any case.

Even if FC Jena had shop rights in these inventions, those rights did not pass to j-fiber. One of the key aspects of shop rights is that they are non-transferable. See Chisum § 22.03[3][c]; Hapgood v. Hewitt, 119 U.S. 226, 233-34 (1886) ("Whatever license resulted . . . to use the invention, was one confined to that corporation, and not assignable by it."). Because shop rights are non-transferable, j-fiber could not acquire any shop rights by purchasing FC Jena's intellectual property assets out of bankruptcy.

j-fiber points out that "a shop right can and will pass where there is a complete succession to the entire business and good will of the licensee." Neon Signal Devices v. Alpha-Claude Neon Corp., 54 F.2d 793, 796 (W.D. Pa. 1931). For instance, a shop right will pass to a successor corporation by merger. See PPG Indus. v. Guardian Indus. Corp., 597 F.2d 1090, 1094 (6th Cir. 1979). Likewise, a shop right can be transferred to a new entity that buys all of the assets of the shop right holder, see Gate-Way, Inc. v. Hillgren, 82 F. Supp. 546 (S.D. Cal. 1949), aff'd per curiam, 181 F.2d 1010 (9th Cir. 1950); and that remains true even if even if the successor company later redistributes the acquired assets among various existing subsidiaries, Cal. E. Labs. v. Gould, 896 F.2d 400, 401-02 (9th Cir. 1990).

But in this case, j-fiber did not succeed to FC Jena's entire business. On the contrary, j-fiber purchased from FC Jena only "certain assets . . . largely consisting of certain intellectual property rights." Docket # 144, ¶ 15. A separate entity called JFA GmbH ("JFA") purchased some of FC Jena's other assets, including its physical facilities and equipment; still other FC Jena assets remained with the bankruptcy trustee. Id. j-fiber now leases FC Jena's former tangible assets from JFA in order to

11

manufacture optical fibers. In other words, although j-fiber resembles FC Jena in many ways, it did not acquire all of FC Jena's assets and it is not FC Jena's corporate successor. j-fiber therefore cannot claim any shop rights that might previously have belonged to FC Jena.

This conclusion is reinforced by equitable considerations. As the Federal Circuit has recognized, whether a particular employer has acquired shop rights is essentially a question of equity and fairness. See McElmurry v. Ark. Power & Light Co., 995 F.2d 1576, 1581-82 (1993). Shop rights recognize and recompense an employer's contribution to inventions developed on company time with company tools. The equitable considerations justifying shop rights may extend to a successor company that takes over the operation of an employer's business in toto. But they certainly do not extend to a company like j-fiber, which just purchased some of FC Jena's assets and leased others in order to run a similar business. Whatever contribution FC Jena may have made to Danilov's and Guskov's inventions, j-fiber has made no such contribution; it cannot equitably claim the benefit of FC Jena's expenditures.[8]

## IV. Conclusion

SolarTech's motion for summary judgment (Docket # 135) is DENIED as to its claim of sole ownership of the '275 patent, and ALLOWED in all other respects. j-fiber's motion for partial summary judgment (Docket # 142) is DENIED.

---

[8] As such, the court need not address SolarTech's alternative arguments that any shop right would be precluded here by the scientists' written employment agreements and intellectual property agreements, and by the license agreement between FiberCore and FC Jena.

|  |  |
|---|---|
| April 24, 2013 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL<br>UNITED STATES DISTRICT JUDGE |